BUILDING INSPECTOR, ET AL. v. McINERNEY
(No. 1864; June 26, 1934; 34 Pac. (2d) 35)

*L. C. Sampson* and *H. B. Henderson, Jr.,* both of Cheyenne, for appellants, who filed a brief and made oral arguments.

For the appellee there was a brief and oral argument by *Clyde M. Watts* and *Carleton A. Lathrop,* of Cheyenne.

RINER, Justice.

This is a proceeding brought under the provisions of Section 22-1007, Wyo. Rev. St. 1931, one of the sections of the zoning law enacted to enable the cities, towns, and villages of the state, as the law itself (section 22-1001, Wyo. Rev. St. 1931) declares, "for the purpose of promoting health, safety, morals and the general welfare" of their respective communities, "to regulate and restrict by ordinance," among other things, "the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes, and may also establish set-back building lines." By this proceeding, a review is sought of a judgment of the District Court of Laramie County which disposed of what the section of the statute first above cited designates as an "appeal" to that court from the decision of the Board of Adjustment, which said section authorizes municipalities to create, and which, in the instant case, was established by the City of Cheyenne, under an ordinance passed in 1931, pursuant to the statutory authority just mentioned.

The facts necessary to be considered now, as they are presented by the record before us, are briefly these:

The south half of Block 365 in the original plat of the City of Cheyenne is bounded on its southerly side by 17th Street; on its easterly side by Morrie Avenue; on its northerly side by an alley extending through the said block in an easterly and westerly direction; and on its westerly side by Russell Avenue. This half block is composed of four lots, each originally platted as 66 feet in width and 132 feet in length, each in its width dimension abutting on 17th Street, and the two corner lots each extending lengthwise along Morrie and Russell Avenues, respectively. The several lots are numbered 5 to 8, inclusive, commencing with the corner lot adjoining Russell Avenue. The property chiefly concerned in the present litigation is the East 52 feet of the corner Lot 8 in said block, at the intersection of Morrie Avenue and 17th Street.

On June 7th, 1933, Andy Kozel, being the owner of that portion of Lot 8 aforesaid, made a signed application, upon a form partly written and partly printed, to the Building Inspector of the City of Cheyenne for a permit to build, on the aforesaid portion of Lot 8, a four-family brick dwelling, the address thereof being given in writing in the application as "1702 Morrie," and as located within a "B" zoning district. On the reverse side of the application, as required by the printed regulations on the form, aforesaid, was set forth a "plot plan" showing the portion of the lot aforesaid, and the location of the proposed structure thereon. This plan indicated the distance from the southerly or side line of the building to the lot line on 17th Street would be 27 feet; that from the easterly or front line of the building to the lot line on Morrie Avenue would be 12 feet 3 inches; the distance from the northerly side line of the building to the lot line on the alley aforesaid would be 44 feet 4 inches; and 3 feet between the extreme westerly or rear line of the structure and the westerly line of the premises owned

by Kozel. The extreme dimensions of the building were shown to be 36 feet 9 inches by 60 feet 8 inches, the latter dimensions fronting on Morrie Avenue.

This application was accompanied with certain blueprint sheets showing the details of construction of the proposed building, and that its main entrance and front elevation faced Morrie Avenue.

The following day, June 8th, 1933, a Building Permit was issued to Kozel, to which was affixed the name of the Building Inspector by a Miss Amy Sherard, an employee in the Inspector's office. This Permit was numbered 5702 and reads in part as follows:

"THIS MAY CERTIFY, That Andy Kozel has permission to erect a 4 family brick residence on the E. 52' of Lot 8, Block 365, fronting on Morrie Avenue, between 17th Street and 18th Street, provided, that the owner or his agents, the architect and builder, shall, in every respect, conform to the terms of the application and to the provisions of the Ordinances of the City of Cheyenne, relating to the regulations for the construction and inspection of buildings.

"Should any section of the Building Ordinance be violated or evaded in any particular, this Building Permit shall immediately be revoked."

All the owners of the remaining portion of the half block aforesaid, being dissatisfied with the issuance of this Permit, thereafter appealed to the Board of Adjustment, as allowed by the State Statute (section 22-1007, Wyo. Rev. St. 1931) and by the Ordinance of the City, previously mentioned. A meeting was had on June 27th, 1933, by the said Board, as the minutes thereof recite, "for the purpose of considering an appeal from the decision of the Building Inspector or City Engineer, in granting Permit No. 5702 to erect a four family apartment house fronting on Morrie Avenue on the East Fifty-two (E. 52) feet of Lot Eight (8) in Block Three Hundred Sixty-five (365) in the City of Cheyenne." All the parties were heard

and the Board took the matter under advisement until July 12th, 1933, when it announced its decision that the Building Permit aforesaid "was issued in accordance to ordinance and therefore the Board found no reason for taking further action in the matter."

The Appellee, W. H. McInerney, thereupon commenced proceedings as indicated by the provisions of section 22-1007, Wyo. Rev. St. 1931, to obtain a review of this determination of the Board of Adjustment by the District Court of Laramie County, and the matter was subsequently heard by that court on September 11, 1933. Evidence was introduced on behalf of McInerney, and also for the Board, the Building Inspector, and the Permittee Kozel. On September 14th following, the District Court entered its judgment wherein it found generally for McInerney, and that said Building Permit No. 5702, issued as described above to Andy Kozel, was "illegal and void," and accordingly adjudged that the decision of the Board of Adjustment should be reversed, and that said Permit "be cancelled and held for naught." It is this judgment of which complaint is here made by the several appellants for whom evidence was given, as stated above, in the court below.

It is contended, on behalf of appellants, that the District Court erred in taking jurisdiction of the proceeding instituted by appellant (now appellee), McInerney, to review the decision of the Board of Adjustment, as provided by section 22-1007, supra, which, among its many provisions declares that, "The decision of the board of adjustment, upon any objection made within the time and in the manner herein prescribed, may be reviewed by the District Court, upon an appeal thereto taken in the following manner," the statute then setting forth the details of the procedure to be pursued to effect this result. Relative to the

hearing on matters of this kind, the section last cited also provides that:

"If upon such hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review."

Our attention is directed to Section 10 of Article 5 of the Constitution of this State, which reads:

"The district court shall have original jurisdiction of all causes at law and in equity and in all criminal cases, of all matters of probate and insolvency and of such special cases and proceedings as are not otherwise provided for. The district court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court; and said court shall have the power of naturalization and to issue papers therefor. They shall have such appellate jurisdiction in cases arising in justices' and other inferior courts in their respective counties as may be prescribed by law. Said courts and their judges shall have power to issue writs of mandamus, quo warranto, review, certiorari, prohibition, injunction and writs of habeas corpus, on petition by or on behalf of any person in actual custody in their respective districts."

It is said that, in order to uphold the jurisdiction of the district court to act as the statute directs it shall "it is necessary to construe the acts of the Board of Adjustment as acts of an inferior court of the county"; that the Board is simply an administrative tribunal and that, as a general rule, a statute which authorizes an appeal to the courts from the action of a nonjudicial body "is an unconstitutional invasion of the powers of such body." 12 C. J. 877, § 379, and 3 C. J. 373,

§ 130, are cited in support of these propositions. But we do not believe that the general contention that the district court was without power to act in this matter, as grounded on these reasons, can be upheld.

[It is material to inquire concerning the nature of the powers exercised by the Board of Adjustment, as those are defined by section 22-1007, supra. Under this statute, the Board is vested with quite extensive duties and powers. Among them, we find it is required to adopt rules in accordance with the provisions of any city ordinance enacted pursuant to Article 10 of Chapter 22, Wyo. Rev. St. 1931 (the state zoning law) ; the presiding officer of the Board may administer oaths and compel the attendance of witnesses; its meetings are public; minutes must be kept of its proceedings, which "shall be a public record"; it hears and decides appeals where it is alleged error exists in any order, requirement, decision, or determination made by an administrative official in the enforcement of the zoning law or any ordinance passed pursuant to it; it hears and decides, also, special exceptions to the terms of the ordinance upon which it must pass under such ordinance; it may authorize upon appeal, in specific cases, such variance from the terms of the ordinance as will not be contrary to the public interest where, due to special conditions, a literal enforcement of such terms will result in unnecessary hardship; and in disposing of appeals to it, it may reverse, or affirm wholly or partly, or may modify the order, requirement, decision, or determination brought before it on appeal, as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.]

In Bellofatto v. Board of Adjustment of Town of Montclair, 6 N. J. M. 512, 141 Atl. 781, the Supreme Court of New Jersey, in considering the powers of a

board of adjustment, in many respects analogous to those possessed by the Board in the case at bar, used this language:

"The powers of the board of adjustment were defined by chapter 146, p. 324, P. L. 1924, and chapter 315, p. 526, P. L. 1926. Thereunder the board had power, among other things to make special exceptions to, and in specific cases make such variance from, the terms of the ordinance as would not be contrary to public interest, where, owing to special conditions, a literal enforcement would result in unnecessary hardship, and so that the spirit of the ordinance should be observed and substantial justice done, and, further, to determine whether the ordinance, so far as it affected the use of the property in question tended to promote the public morals, health, safety, or welfare, and, if it did not in such instance, it might modify or vary any requirement thereof. The board was also given power to administer oaths and compel attendance of witnesses. Such board, when it acts, acts judicially on a lawful ascertainment of facts. Bilt-Wel Co. v. Dowling, (N. J. Sup.) 135 A. 798."

In the somewhat earlier case of Hendey v. Ackerman, 103 N. J. Law 305, 136 Atl. 733, 735, the same court had said:

"It is the undoubted purpose of the statutes, creating boards of adjustment, to make them *quasi* judicial bodies and that they are to proceed in a judicial manner to pass upon and render judgment in those matters which, by statute, they are given jurisdiction over."

Speaking of the powers of the board of standards and appeals of the City of New York, in dealing with an appeal to it from the action of the superintendent of buildings refusing a permit for an automobile garage, under zoning regulations, it is said in People v. Leo, 198 N. Y. S. 397, 399, subsequently affirmed, 215 App. Div. 696, 212 N. Y. S. 897, that:

"The board of appeals can in no sense act other than in a *quasi* judicial capacity. It does not perform a single administrative or legislative act. As its name

implies, it is an appellate tribunal. It passes upon matters formally brought to its attention, much the same as courts. It hears evidence and argument, and decides controversies as the evidence dictates. It cannot act without some evidence. The record here shows that it denied this application for good reason and upon sufficient evidence to sustain its conclusion. There was not a scintilla of evidence presented to the board to warrant it in changing its final disposition of this proceeding. Presumably it had thoroughly considered the matters before it. A committee of its members had viewed the premises, and they had heard the parties in favor of and in opposition to the application. They acted judicially, and adopted one of the only two courses open to it, namely, to grant or deny the application."

In State v. Roberson, 198 N. C. 70, 150 S. E. 674, 675, we find the following language used relative to the functions of the board of adjustment, under the zoning law in North Carolina:

"Our statute law with respect to zoning regulations is embraced in C. S., 2776 (r) *et seq.* Section 2776 (x) provides for the appointment of a board of adjustment, who shall hear and decide appeals from and review any order, requirement, decision, or determination made by an administrative official charged with the enforcement of any ordinance adopted pursuant to the act. It further provides that every decision of the board shall be subject to review by proceedings in the nature of *certiorari.* The statute thus confers upon the board the right to exercise the functions and powers of a *quasi* judicial body. This is the court's conclusion as stated in *Harden v. Raleigh,* 192 N. C. 395, 135 S. E. 151, and in *Little v. Raleigh,* 195 N. C. 793, 14 S. E. 827."

So, in Anderson v. Jester, 206 Iowa 452, 221 N. W. 354, 357, the court, discussing the provisions of the Iowa zoning statutes which authorized the establishment of a board of adjustment, and used phraseology in many respects identical with that employed in section 22-1007, supra, said:

"Section 6461 authorizes appeals to the board of adjustment, and Section 6463 confers upon the board 'the following powers:

'1. To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this chapter or of any ordinance adopted pursuant thereto.

'2. To hear and decide special exceptions to the terms of the ordinance upon which such board is required to pass under such ordinance.

'3. To authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done.'

"Section 6464 empowers the board, in conformity with the provisions of the chapter, to make 'such order, requirement, decision, or determination as ought to be made.'

"The board of adjustment exercises administrative and *quasi* judicial power. *In re Appeal of Head*, 141 Iowa 651, 665, 118 N. W. 884; *Harden v. City of Raleigh*, 192 N. C. 395 (135 S. E. 151); *Norcross v. Board of Appeal*, 255 Mass. 177 (150 N. E. 887)."

The Supreme Judicial Court of Massachusetts, in Coleman v. Board of Appeal of Building Department of Boston, 281 Mass. 112, 183 N. E. 166, 167, is authority for the following statement concerning the powers of the board of appeal aforesaid, under the zoning law of that state:

"The authority conferred on the respondents by the statute is *quasi* judicial in its nature. They are required to exercise sound judgment in the proceedings which are brought before them. Their decisions may be examined by *certiorari*. Their return on a petition for *certiorari* is 'conclusive as to all matters of fact within the jurisdiction,' passed upon by them. Tewks-

bury v. Middlesex County Commissioners, 117 Mass. 563, 565; Marcus v. Board of Street Commissioners, 252 Mass. 331, 333, 147 N. E. 866."

Recurring just here to 12 C. J. 877, § 379, cited by appellants, that text, after stating in substance that, generally speaking, statutes allowing an appeal from the action of a nonjudicial body may not stand as constitutional, nevertheless says: "but such an appeal may be authorized from an action of a nonjudicial body in a case involving individual or property rights of which the court was entitled to take jurisdiction under some other form of procedure." And the other citation taken from the same text, 3 C. J. 373, § 130, is to the following effect:

"No appeal will lie from the decision of a special tribunal, constituted for a particular purpose, unless such appeal is expressly authorized by statute. The legislature, however, may provide for such an appeal to review judicial, as distinguished from ministerial or administrative, decisions."

Under these authorities, we think it clear that the Board of Adjustment, acting pursuant to the statute here involved, exercises both administrative and *quasi* judicial functions; and that certainly, in this çase where the claim is presented that the Board is acting without authority of law in affirming the issuance of the permit in question, the legislature could properly authorize what it designated an "appeal" to the district court to correct such action. That court, in the exercise of its general and ordinary jurisdiction, is authorized to keep official action within the bounds marked out for it by law. In this connection, it will be recalled, as said in Budge v. Board of Commissioners, 29 Wyo. 35, 208 Pac. 874, that:

"The generally accepted doctrine is that under constitutional provisions similar to those of this State the legislature may 'pass any acts that are not expressly or by necessary implication inhibited,' by the state or

the United States Constitution (12 C. J. 746 and extended list of cases cited in Note 5)."

To the same effect are State ex rel. Agricultural College v. Irvine, 14 Wyo. 318, 389, 84 Pac. 90, 106; State ex rel. Budge v. Snyder, 31 Wyo. 333, 343, 225 Pac. 1102. There is nothing in Section 10 of Article 5 of the Wyoming Constitution which in any wise denies the power of the legislature to provide for an "appeal" to the district court from a board exercising such powers as those with which the Board of Adjustment here involved is invested, to consider matters such as judicially should be determined.

There is another view of this question which leads to the same result. While the word "appeal," when used in its technical sense, suggests the removal of a case from an inferior to a superior court for review, it does not always have that meaning when used in statutes regulating procedure. It is not infrequently employed in the sense of being simply a method of bringing before a court for judicial determination a controversy of a character such that it comes fairly within the court's original jurisdiction. As illustrative of this use of the word "appeal," we refer to the following cases:

In Appeal of Hotel Bond Co., 69 Conn. 143, 93 Atl. 245, 248, there was involved an "appeal" to the superior court of Connecticut from a finding and award made by a commissioner under a Workmen's Compensation statute, and, concerning its nature, the Supreme Court of Errors said:

"An "appeal' from an administrative official or board to the superior court is a familiar remedy in our statute law. We hold such 'appeal' to be an original application to the superior court to exercise its appropriate judicial power in respect to acts done by the administrative tribunal in excess of its power, or in the unlawful abuse of that power. Moynihan's Appeal, 75 Conn. 358, 53 Atl. 903."

Another and later case from the same jurisdiction, that of De Flumeri v. Sunderland, 109 Conn. 583, 145 Atl. 48, 49, dealt with an "appeal" authorized by the statute, and taken by De Flumeri from the action of the Mayor of the City of Danbury in denying the former's application for a certification of approval of the location of a gasoline filling station. In harmony with the views previously expressed, the court enlarges upon the matter thus:

"The nature of the so-called 'appeal' allowed by various statutes from the decisions of administrative boards has been discussed in numerous cases in this court, and its true character is definitely settled. It is not an appeal in the sense of a transfer of jurisdiction from one court to another, but simply provides 'a process, under the misleading name of appeal, for invoking the judicial power to determine a legal injury complained of, or the legality of an act done by the officers of another department.' Malmo's Appeal, 72 Conn. 1, 6, 43 A. 485, 487."

In Police v. The Industrial Commission of Ohio, 23 Oh. Cir. Ct. (N. S.) 433, it appeared that the court of common pleas had declined to entertain an appeal of the plaintiff from the final action of the Industrial Commission of Ohio but had dismissed it for want of jurisdiction, the plaintiff asserting that the commission had denied him that award for injuries sustained to which he was legally entitled. The law in question provided that the claimant, within thirty days after the notice of final action of such board, might, "by filing his appeal in the common pleas court of the county wherein the injury was inflicted, be entitled to a trial in the ordinary way and be entitled to a jury if he demands it." Reversing the judgment below, the Court of Appeals, among other things, said:

"We are inclined to think that much of the discussion as to whether this case in its progress from the commission to the common pleas court was an appeal in strictness of words or not, has been too technical

and grudging in scope to promote the ends of the law. The word appeal has different meanings in different jurisdictions, and varies widely in its application to various sets of circumstances. Of course, the appeal here was not an appeal in the sense that it brought the case up from an inferior to a superior court or judicial body; the defendant's functions are administrative. Constitutionally, they can not be assimilated to those of a court. This point has been settled, specifically, in *State, ex rel. Yaple* v. *Creamer*, 85 O. S. 349 (97 N. E. 602, 39 L. R. A. (N. S.) 694), where the predecessor of the present law in question was under review.

"What really is meant by the word appeal, as applied to the right of the plaintiff to come into the court below, is a mode of removing his cause from an administrative to a judicial tribunal—he having, as he says, been denied his legal right by the action or non-action of the former. In a popular and perhaps inaccurate sense of the term, this method of passing his grievance on to a court from a board may be called an appeal, and in this sense we think the word is used when the statute authorizes the removal. Considering the just and beneficent end sought by the entire enactment, it should not be defeated in any case by applying a mere verbal rule of strictness destructive of its plain intendment. 'The letter (of the law) killeth, but the spirit giveth life.' "

The case of Routh v. Board of Com'rs of Finney County, 84 Kan. 25, 113 Pac. 397, was one where the Supreme Court of Kansas was required to consider whether the district court had jurisdiction to render a judgment in an "appeal" taken from the board of county commissioners, pursuant to statute, by one whose claim for rent had been rejected by that body. Affirming the power of the district court to act in the matter and disapproving the contention that that court had only appellate jurisdiction in the premises and that, as the county board had no jurisdiction to adjudicate the question of title of real estate, the district court on appeal had none, the appellate court pointed out that:

"This argument assumes that the commissioners in effect constitute a court, and exercise a strictly judicial function in passing upon claims against the county. That is the rule in many states (7 A. & E. Encycl. of L. 1003; 35 Am. St. Rep. 203, note), but not in Kansas (Leavenworth Co. v. Keller, 6 Kan. 510, 522, 523). In the case cited it was said: 'It is true that the allowance was so far judicial that an appeal could be taken from the decision if adverse to the claimant; but not in the sense which is usually given to word 'judicial.' The appeal is given that the case may be heard judicially, and the method of getting the case into court is by appeal.' As suggested by the language quoted, what is called an appeal is really only a means of getting the controversy before a court. It is a substitute for filing a petition and causing a summons to issue. The district court in the one case as in the other acquires and exercises original and not appellate jurisdiction, and has power to pass upon a question of title to real estate if the validity of the claim in controversy is affected thereby."

So, in Rowland v. The Little Vermilion Special Drainage District, 254 Ill. 543, 98 N. E. 969, 971, it was held that a statute was not unconstitutional in providing for an appeal to the county and circuit courts from the decision of drainage commissioners relative to the classification of lands for assessment purposes, and the opinion employs the following pertinent language:

"The jurisdiction of a court to hear and determine a matter brought to it by an appeal from a non-judicial body depends upon the nature of the rights involved rather than upon the character of the body from which such appeal is taken. A reference to the cases decided by this court which are cited in *Conover v. Gatton,* supra, (251 Ill. 587 [96 N. E. 522]), and reviewed in the dissenting opinion, will show that this court has sustained statutes allowing appeals from non-judicial boards and bodies where the subject matter involved was some personal or property right which it is the province of courts to determine and protect. The drainage commissioners, in making the classification

of the lands of the district, are dealing directly with a valuable property right of the tax-payers. The classification is the basis upon which future assessments are to be made. It is, in effect, a valuation, for assessment purposes, of the benefits each tract of land will receive from the proposed improvement. It is the exercise of a power over the property of the citizen which, if improperly used, may result in the end in a violation of the constitutional right of the property owner, in that he may be required to pay a larger proportion of the cost of the improvement than his lands are benefited, or he may be required to pay a larger proportion of taxes than others in proportion to benefits received. It would be a reproach to our judicial system if there were no redress for possible wrongs that might be inflicted by an unequal and oppressive classification of lands in a drainage district for assessment purposes. The legislature has provided a remedy by an appeal to the county court by any land owner who appears and objects to his classification, and since, as we have attempted to show, the nature of the rights involved are such as are properly cognizable by the judiciary when properly brought before it, the statute authorizing an appeal as a means of bringing the matter before the court is not unconstitutional."

See, also, Reppy v. Jefferson County, 47 Mo. 66; Gurnee v. Brunswick, 1 Hughes 270, Federal case No. 5872; Chicago etc. R. Co. v. Railroad Commission of Indiana, 38 Ind. App. 439, 78 N. E. 338, 79 N. E. 520. It may well be that the so-called appeal, in section 22-1007, supra, from the board of adjustment to the district court may be regarded simply as a method of invoking the original jurisdiction of that court. We have already indicated that the rights sought to be enforced in the case at bar are such as are properly cognizable by the district court in the exercise of that jurisdiction.

It is urged that the first "appeal" taken by McInerney and the other property owners, other than Kozel, in the half block aforesaid, from the issuance out of

the Building Inspector's office of the permit in question, was not properly grounded, but no question of that sort appears to have been presented to the Board of Adjustment. That body proceeded to hear the parties and dispose of the appeal by holding that the permit was issued according to law. In our judgment, such a contention presented in the court below or this court for the first time comes quite too late. It must be remembered in this connection, too, that proceedings of this character must necessarily be somewhat informal and not be measured by the strict rule ordinarily applied to the removal of cases on appeal from court to court. In addition, it is apparent from an inspection of the statutory source of the Board's power that the functions performed by that body in the consideration of an appeal of this character before it are hardly confined strictly to a review of the matter such as would, for instance, prevail in an ordinary case on appeal to this court from a district court. There is the significant language in the law declaring that the Board, in disposing of an appeal by modification, reversal, or affirmance of the order, decision, requirement, or determination, "as ought to be made, * * * shall have all the powers of the officer from whom the appeal is taken."

Appellants here contend that the permit aforesaid was issued in strict accord with the requirements of the zoning ordinance of the City of Cheyenne, and that the district court accordingly erred in finding that such permit was "illegal and void." In order to determine this question, the one chiefly argued on the hearing, it will be necessary to examine certain provisions of the zoning ordinance aforesaid.

When the application for the permit under consideration was made, the half block of which the property affected was a part was located in what the zoning ordinance classifies as a "Residence 'B' District." In

such district, it is required by section 5 of said ordinance that:

"For every building there shall be a front yard and a rear yard each of not less than 20 feet in depth and there shall be side yards the same as required in a Residence 'A' District."

The yards prescribed for a "Residence 'A' District" are indicated in section 4 of the ordinance, as follows:

"For every building there shall be a front yard and a rear yard each of not less than 25 feet in depth and a side yard on each side of the building of not less than 5 feet in width; provided that for each 1 foot added to the width of one side yard over and above 5 feet, the width of the other side yard may be decreased 1 foot, but no side yard shall be less than 3 feet wide; provided further that for public or semi-public buildings there shall be side yards of not less than 10 feet in width."

In section 2 of said ordinance, under the title "Definitions," we find the following terms employed therein explained as follows:

"Yard, Front—A front yard is an open space on the same lot with a building, unoccupied except as hereinafter permitted, extending the full width of the lot and situated between the street line and the front line of the building projected to the side lines of the lot.

Yard, Rear—A rear yard is an open space on the same lot with a building, unoccupied except as hereinafter permitted, extending the full width of the lot and situated between the rear line of the lot and the rear line of the building projected to the side lines of the lot.

"Yard, Side—A side yard is an open space on the same lot with a building, unoccupied except as hereinafter permitted, situated between the side line of the building and the adjacent side line of the lot and extending from the rear line of the front yard to the front line of the rear yard. If there be no front yard the front boundary of the side yard shall be the street line and if there be no rear yard the rear boundary of the side yard shall be the rear line of the lot.

"Frontage—All the property abutting upon one side of a street between two intersecting streets, measured along the street line.

"Corner Lot—A lot situated at the junction of two or more streets.

"Interior Lot—A lot other than a corner lot."
In area subdivision 6 of section 11, dealing with sundry height and area exceptional cases, under said ordinance there is used this language:

"On corner lots the side yard regulations shall be the same as for interior lots except in the case of reversed frontage where the corner lot faces an intersecting street. In this case there shall be a side yard along the street side of the corner lot of a width equal to not less than 50 per cent of the depth of the front yard required on the lots in the rear of such corner lot, and no accessory building on the corner lot shall project nearer the street than the front yard line of the lots in the rear."

In connection with these regulatory provisions and definitions may very well be considered the following judicial interpretations of the word "front" when applied to a building or a city lot, in their relation to adjoining thorofares:

In Dinnick v. City of Toronto, 3 D. L. R. 310, the court said: "Any side or face of a building is a front, although the word is more commonly used to denote the entrance side."

The meaning of the words "front foot" was in question under a municipal resolution assessing for street improvements according to that method certain abutting property, in Betz v. The City of Canton, 18 Oh. Cir. Ct. 676, 32 Wkly. Law Bull. 92, and, in concluding the opinion filed, this language was used:

"We think the legislature used the words 'front foot' in the ordinary popular signification, and that in this case the front of a lot is determined by the architectural construction of the main buildings, their use and

occupancy, and not by the entrance into subordinate or out buildings."

Similarly, in Haviland v. City of Columbus, 50 Oh. St. 471, 34 N. E. 679, 680, a case which also presented the question of assessing abutting property by the front foot rule, the court expressed its views thus:

"Lots usually front breadthwise, and not lengthwise, on a street. But a lot may be built upon, used, and occupied with reference to a street on which it lies lengthwise, and in such case, for the payment of an improvement on the street, should be assessed for its full length, where the mode of apportionment adopted is by the front foot."

In Adams v. Howell, 58 Misc. 435, 108 N. Y. S. 945, 947, the plaintiffs sought to restrain the defendant from violating certain building restrictions contained in a deed relative to the use of a lot on the corner of Summit Avenue and Amherst Street. The defendant urged that these restrictions had no application to Amherst Street frontage. Rejecting this contention, the court points out that:

"It must be conceded that, as plotted by Thorne & Angell, it was contemplated that the defendant's lot should front on Summit avenue, and not on Amherst street. The defendant, however, has by his acts changed the frontage, in part at least, by converting what was originally a side line into a front line, by facing the proposed dwelling on Amherst street."

Another case where the remedy by injunction was sought for the same purpose as in that last above cited is Rhinehart v. Leitch, 107 Conn. 400, 140 Atl. 763, where the court said:

"The issue turns upon the question whether or not the foundation of the house as now planned will be within twenty-five feet 'of the street line on which said lot fronts.' The word 'front' as applied to a city lot has little, if any, inherent application, but it takes on a borrowed significance from the building which is or may be constructed thereon. *Connecticut Mutual Life*

*Ins. Co. v. Jacobson,* 75 Minn. 429, 432, 78 N. W. 10; *Adams v. Howell,* 58 Misc. 435, 108 N. Y. Supp. 945, 947. As applied to a building, 'front' in general usage refers to that side of it in which is located the main entrance. *Howland v. Andrus,* 81 N. J. Eq. 175, 180, 86 Atl. 391; Oxford and Standard Dictionaries, 'front.' When used of a lot with a house upon it, it means that portion of the lot abutting upon the street toward which the house faces."

The opinion in Bianco v. City Engineer & Building Inspector, 187 N. E. (Mass.) 101, 103, expresses the view that:

"The front line and the rear line of a lot cannot well be described by a hard and fast rule of law applicable to all cases. The determination of the question is largely a matter of fact."

See, also, Rombauer v. Compton Heights Christian Church, 328 Mo. 1, 40 S. W. (2d) 545, 551.

In the case at bar, under the facts disclosed in the record, when examined in the light of these authorities there can be not the slightest doubt as to the location of the front line of the proposed building. It unquestionably faces Morrie Avenue on which the application, itself, for the permit in question, places the address number; the permit, too, is for a building "fronting on Morrie Avenue"; the blueprint plans of the structure themselves disclose the same fact; and the Board of Adjustment likewise regarded the position of the building as "fronting on Morrie Avenue," for its minutes so indicate.

Subdivision 6 under section 11 of the zoning ordinance, it will be remembered, deals with the exceptional case of a corner lot where what is designated as "reversed frontage where the corner lot faces an intersecting street" prevails. It is plain from the definition given by the ordinance to the term "frontage" that, in the ordinary situation where all the buildings on all the lots front one way, i. e., as the lots were

platted, Morrie Avenue and Russell Avenue would be regarded as "intersecting" streets with relation to the lot frontage in the half block aforesaid, on 17th Street. Webster's Dictionary, however, defines the term "reversed" as "turned backward or the contrary way; turned side for side or end for end." What is meant, then, by "reversed frontage" is such a case as we now have, where the owner of the lot, by the manner in which he has located his building, has, as a matter of fact, turned the frontage of that portion of Lot 8, which he owns and which as platted would front on 17th Street, "side for side or end for end," causing, so far as the use of the property is concerned, it to have its frontage on Morrie Avenue. It is, of course, unquestioned that the use of the property is what the ordinance undertakes specifically to regulate.

This view of the matter harmonizes, too, with the definition of front, rear, and side yards, as prescribed by the ordinance. For example, a front yard is the space situated "between the street line and the front line of the building projected to the side lines of the lot." If the side lines of the lot as platted be regarded as what are meant by this definition, in the case of "reversed frontage," the definition merely results in nonsense. By regarding the lot frontage as "turned side for side or end for end" by the owner's use thereof, the definition is easily applied. As repeatedly pointed out above, there is no question in this case as to which way the proposed building was to face or front, and, hence, in determining the front yard area, the "front line of the building projected" must extend in a northerly and southerly direction. Again, there is, as we have seen, a special regulation of side yard areas in the case of reversed frontage which would serve no useful purpose and really be devoid of meaning, if the lot lines as platted were only to be taken into consideration. As we interpret this last men-

tioned clause of the ordinance, it serves to prevent the owners of corner lots, who reverse their frontage, from cutting off light and air from the buildings on the interior lots.

Applying the conclusions thus reached to the matter in hand, it is apparent that the proposed use of the property by the permittee does not coincide with the requirements of the ordinance in question. The front yard proposed is but 12 feet 3 inches from the line of Morrie Avenue to the front line of the building as planned, when it should have been 20 feet. So the rear yard should have had a depth of 20 feet, yet the one proposed is but 3 feet. It follows that the permit was issued contrary to the provisions of the zoning ordinance, and the district court properly held it to be illegal and void.

It may be that the construction of the ordinance as thus announced may, in the case at bar, practically result in forcing a frontage of the proposed building on 17th Street. But that is not due alone to the requirements of the zoning ordinance. It is due quite as much to the fact that the permittee purchased the portion of the lot he did. If he had bought only the east 32 feet of Lot 8 aforesaid, employing the front and rear yards even as proposed by the permittee and as allowed by the permit would render the location of a practicable building on the property rather doubtful, to say the least, when fronted as proposed. But however this may be, no reason or authority has been advanced in the argument or brief of appellants in this court why the result thus reached in this case would conflict with fundamental law as an unreasonable or unconstitutional exercise of the police power— the power from which all municipal zoning regulations derive their efficacy. We have discovered none.

Before concluding this opinion, it should be noted

that the ordinance under consideration designates the Building Inspector as the official who shall, in the first instance, issue permits under the zoning law. No other person seems to be assigned that duty and authority. In the record of this matter ,there is undisputed testimony that the Building Inspector never even saw the application made by Kozel until after a permit had been issued—in short, that it was issued by an employee in the Inspector's office whose legal authorization to do so does not appear. It is unnecessary, perhaps, to say that such a procedure is fraught with danger, and may raise serious question as to the validity of the permit issued in such manner. The point does not seem to be urged, however, by appellee.

The judgment of the district court will be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.