RESTIVO ET AL. *v.* PRINCETON CONSTRUCTION
COMPANY, INC.

[No. 93, September Term, 1960.]

518

*Decided November 29, 1960.*

*Separate motions for rehearing filed by the appellee and by the Mayor and City Council of Baltimore as amicus curiae December 14, 1960, denied January 13, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Samuel S. Eisenberg* for the appellants.

*James B. Murphy, Assistant City Solicitor of Baltimore,* with whom was *Harrison L. Winter, City Solicitor,* on the brief, for the City of Baltimore, as *amicus curiae.*

*Z. Townsend Parks, Jr.,* with whom was *H. Emslie Parks* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

On November 3, 1958, Princeton Construction Company, Inc., the appellee, was granted by the Building Inspection Engineer of Baltimore City (Zoning Commissioner) permits to construct eighteen houses on a vacant tract of land in a residential, Class D zoning area. The tract, containing about an acre, has a frontage of 109.3 feet on Mayfield Avenue (a street forty feet wide) with a depth of 393.33 feet, and is bounded on two sides by fifteen-foot alleys, and on the fourth side by a twelve-foot alley, proposed to be widened to fifteen feet. The subdivision plan called for houses in batteries of four and five on each side of a central court, designated as a "utility right-of-way" twenty feet wide, extending lengthwise through the center of the tract, in which were to be located the facilities for water, lights and sewer lines, with a five-foot walkway in the middle for ingress and egress. There were to be parking areas accessible from the side alleys. Protesting neighbors appealed to the Board of Municipal and Zoning Appeals, which on December 2, 1958, unanimously reversed the action of the Building Inspection Engineer, and cancelled the permits. Judge Oppenheimer affirmed the Board on appeal to the Baltimore City Court. An appeal to this Court was entered on March 16, 1959, and was dismissed by Princeton on July 6, 1959.

Before the dismissal, Princeton made another application for permits to build upon the same tract, which was granted by the Building Inspection Engineer on March 30, 1959. Another appeal to the Board was entered by the protestants and heard on May 26, 1959. Three members voted for cancellation of the permits and two against cancellation. Both sides appealed to the Baltimore City Court, where on March 17, 1960, Judge Cullen, treating the Board's action as disapproving the issuance of the permits, reversed and ordered that the permits be issued. The protesting neighbors appealed here.

A number of questions are posed and argued in the briefs. The protestants contend that the second application was for substantially the same proposal as the first and that the Ordinance bars such a second application within twelve months from the rejection of a prior application. They further contend that the second application was barred by the pendency of an appeal to this Court. On the merits they argue that the issuance of the permits is in violation of the Ordinance in respect to set-backs and the lack of proper access by vehicles and fire apparatus. Princeton raises a question as to the effect of the vote by only three members of the Board, contending that the concurring vote of less than four members had the effect of affirming the action of the Building Inspection Engineer.

The Baltimore City Code, Art. 40, sec. 35(d) (Supp. 1958) provides:

> "Appeals to the Board of Municipal and Zoning Appeals may be taken by any person aggrieved, or by any officer, department, board or bureau of the municipality affected, by any decision of the Zoning Commissioner. Such appeal shall be taken within a reasonable time as provided by the rules of the Board by filing with the Zoning Commissioner and with the Board of Municipal and Zoning Appeals a notice of appeal, specifying the grounds thereof. The Zoning Commissioner shall forthwith transmit to the Board all the papers constituting the record upon which the action appealed from was taken. If an application is disapproved by the Board of Municipal and Zoning Appeals, thereafter the Board shall take no further action on another application for substantially the same proposal, on the same premises, until after twelve (12) months from the date of such last disapproval."

Among the powers conferred upon the Board by Baltimore City Code, Art. 40, sec. 35(g) (Supp. 1958), is "To hear and decide appeals where it is alleged there is error in any

order, requirement, decision or determination made by the Zoning Commissioner in the enforcement of this Article."

Princeton contends that sec. 35(d) does not apply to "Negative Appeals." Certainly protestants fall in the category of persons "aggrieved." We decline to construe the words "if an application is disapproved" as confined to cases where the Board acts in an original rather than an appellate capacity or to cases where there is an initial disapproval by the Building Inspection Engineer. We think the section is applicable whenever the Board disapproves an application, whether on appeal or otherwise. The obvious purpose of the section is to provide a period of repose. It would defeat that purpose if repetitive applications for substantially the same proposal on the same premises could be reviewed in the one case but not in the other.

Nevertheless we do not decide whether the second application was "for substantially the same proposal" because for the reasons hereafter given we think both proposals violated the Zoning Ordinance and required denial of the building permits. We deem it appropriate, in view of the lapse of time since the first application and our views on the merits, that the real point in the case be determined now.

The protestants' contention as to the legal effect of the pendency of the appeal to this Court must be rejected. It seems clear that in a proper case a court may stay proceedings pending the determination of another proceeding that may affect the issues raised. Cf. *Noel v. Noel,* 173 Md. 147, 151. Here, however, the appeal was dismissed before the second appeal came on for hearing in the Baltimore City Court. We have held that, under some circumstances at least, the dismissal of an appeal may open the door for action by the trial court upon the judgment appealed from. *Tiller v. Elfenbein,* 205 Md. 14, 21, and we see an analogy in the present circumstances.

We find it unnecessary to resolve the question raised as to the effect of the Board's vote on the second appeal. Judge Cullen found that the disapproval of the issuance of the permits by three members of the Board was not supportable un-

der the facts and the law, and hence was arbitrary and illegal. He found no need to construe sec. 35(i). If we assume, without deciding, that the vote of four members is necessary to reverse (although the situation here is somewhat different from that in *Mayor & C. C. of Balto. v. Biermann,* 187 Md. 514), and that the effect of the Board's vote was to approve the action of the Building Inspection Engineer, the appeal by the protestants would still raise the issue as to whether the permits were properly issued and in compliance with the Ordinance, regardless of the scope of review. We turn to the merits.

On the first appeal the Board found that the development plan would "leave the owners and occupants of these homes without proper access for vehicles or fire fighting apparatus." Judge Oppenheimer remarked that it was "not for the court to weigh the correctness of these findings." But the appellee contends that if the plan was in compliance with all the provisions of the Zoning Ordinance and in the absence of any request for or any necessity for a special exception or variance, the Board had no authority to disapprove the permits on the general grounds that the plan presents traffic or fire hazards. We think the contention is sound. The Baltimore City Code, Art. 40, sec. 35(j) (Supp. 1958), provides:

"Where in this Article, the Board is authorized to make special exceptions or variances, it shall give approval only where the proposed building, structure, extension, alteration or use of land, buildings or structures, changes or use of land, or buildings or structures, size of yards, size of buildings or density of population shall not create hazards from fire or disease or shall not menace the public health, security, or morals. In determining such questions the Board, when passing upon applications relating to use, shall give consideration to items (a) to (1), inclusive, of Section 2 and, when passing upon applications relating to height, shall give consideration to items (a) to (n), inclusive, of Section 18 and when passing upon applications relating to area, shall

give consideration to items (a) to (n), inclusive of Section 22 in so far as they or any of them may relate thereto."

We find it clear that the effect of the language requiring the Board to consider and apply the standards mentioned is limited to instances where the proposal involves a departure from and a relaxation of the restrictions of use and building design set up in the Ordinance. The limiting of uses and designs by the Ordinance is sustainable only as an exercise of the police power. See *R. B. Construction Co. v. Jackson,* 152 Md. 671, 674, and 1 Yokley, *Zoning Law & Practice,* § 164 (2d ed. 1953), page 410. So, where a given plan complies with every limitation imposed by the Ordinance, the Board is not authorized to prescribe further limitations based on its own concepts of what is desirable in the public interest, or because it thinks, as stated in the second appeal, that the subdivision plan is "not a good plan." Cf. *Windsor Hills Imp. Ass'n v. Mayor & C. C. of Baltimore,* 195 Md. 383, 389.

The protestants contend, however, and this is the heart of the case, that Princeton's plan is illegal because it does not provide the setbacks or front yard space required by the Ordinance. Princeton concedes the proposed front yard spaces would be inadequate if the lots fronted on a street, but contend that the provisions of the Ordinance as to front yards are inapplicable since the houses will front on the twenty-foot right-of-way and not on any street. Thus, the basic question comes down to whether the Ordinance requires that houses front on a street.

Section 48 of the Ordinance includes the following definitions:

(c) "The term 'street' shall apply to any street thirty feet or over in width."

(d) "The term 'alley' shall apply to any street less than thirty feet in width."

(t) "Front or Frontage" is "That side of a lot abutting on a street or way and ordinarily regarded

as the front of the lot, but it shall not be considered as the ordinary side line of a corner lot."

(b) "Lot. A lot is a parcel of land now or hereafter laid out and occupied by one building * * * including such open spaces as are required by this ordinance."

(h) "Corner Lot. A lot of which at least two intersecting sides abut for their full length upon a street."

(i) "Interior Lot. A lot other than a corner lot."

(m) "Front Yard. A clear, unoccupied space on the same lot with a building, extending across the entire width of the lot and situated between the front line of the building and the front line of the lot."

Section 1 of the Ordinance states that in order to accomplish its purpose of promoting the health, security and general welfare of the community, "the height * * * of buildings * * * the percentage of lot that may be occupied, the size of yards * * * the location and use of buildings * * * are regulated and restricted as hereinafter provided."

Section 22 provides: "For the purpose set forth in Section 1 and considering * * *" among other things:

"* * *

(j) access of light and air to buildings;

(k) access for fire and police protection;

(l) protection of occupants of buildings from noise, dust and gases caused by traffic;

(m) hazards from fire and disease;

* * * the size and location of yards and other open spaces and the density of population are hereby regulated and restricted, and the City of Baltimore is divided into eight classes of area districts, namely * * *."

Section 23 says: "No building shall be constructed except in accordance with the area regulations hereinafter prescribed for the area district in which such building is * * * proposed to be located."

Section 26 reads: "Front yards * * * shall be required also in all * * * D * * * Area Districts, and the depth of required front yard in the several districts shall be as herein provided."

Section 27, headed "Front Yards Along Undeveloped Streets," provides that in a D area district "where, at the time of the passage of this Ordinance, there are no existing buildings * * *.

> (2) on lots fronting on the side of a street, between two intersecting streets, which street may be laid out after the passage of this ordinance,

buildings shall be provided with front yards, the minimum depth of which shall be determined by the depth of the lot and by the width of the street on which it abuts, and shall be as set forth in the following table: * * *."

We think the necessary, indeed the inescapable, effect of the words of the Ordinance is to forbid Princeton's using its land as it planned to use it. That which necessarily is implied in a statute is as much a part of it as that which is expressed. "In a broad sense, true implications are as much a part of the language which makes up the statute as the meanings of the various words are a part of it. Viewed from this standpoint, no exception is created to the general rule that the intent of the law-makers must be derived from the language used in the enactment." *Crawford, Statutory Construction,* Sec. 168. See also 3 *Sutherland, Statutory Construction* (3rd Ed. 1943), Sec. 5402; 82 C.J.S. *Statutes,* Sec. 327, p. 633.

The Ordinance says in so many words that in order to promote the health, security and general welfare of the community no building shall be erected "except in accordance with the area regulations" for the district in which it is to be located (Sec. 23). Front yards are required in all D area districts, of a size "as herein provided" (Sec. 26). On undeveloped streets in D area districts every lot ("a parcel of land * * * occupied by one building and * * * including such open spaces as are required by this ordinance") must have a front yard "the minimum depth of which shall be determined by the

depth of the lot and by the width of the street on which it abuts," as set forth in a table which follows (Sec. 27). The table shows front yard depths calculated only in relation to a street as defined in the Ordinance, that is, thirty feet and more in width.

Since the Ordinance expressly provides that no building can be erected in a D area zone unless it is on a lot which has a front yard of a minimum depth proper in relation to the width of the street on which it fronts, it follows inescapably, we believe, that no such structure can lawfully be erected unless it is on a lot which fronts on a street. The Supreme Judicial Court of Massachusetts, speaking through Chief Justice Rugg in *Siegemund v. Building Com'r of City of Boston,* 156 N. E. 852, said that buildings could not be erected to front on a "proposed court, or private way" (called "Franklin Gardens") because their lots lacked the requisite setbacks from "the street" and "the street line" which the statute required a new building to have. It was held that the term "street" as used in the statute meant a public way and that the proposed private court or way did not come within the meaning of "street" as used in the statute. The inference that a statute required a lot to front on a street seems to have been drawn also by the Court of Errors and Appeals of New Jersey in *Tzeses v. Barbahenn,* 17 A. 2d 539.

The Baltimore City Ordinance gives other internal indications that a parcel of land on which a building is to be erected must front on a street. "Front or frontage" is "That side of a lot abutting on a street or way * * *." A corner lot is "A lot of which at least two intersecting sides abut for their full length upon a street." The height district regulations in Sec. 19 measure permitted height (except for forty-foot height districts) by so many times "the width of the street," and unless a building was to be on a lot which fronted on a street, its permitted height could not be measured. Section 34, "Enforcement," of the Ordinance requires that the plat, which must be filed as a prerequisite to the issuance of a building permit, show the "names of all streets upon which the lot abuts."

Provisions requiring buildings to front on a public street

seem not to be uncommon in zoning ordinances and generally have been upheld. 8 *McQuillin, Municipal Corporations* (3rd Rev. Ed. 1957), Sec. 25.143, says: "A zoning or other ordinance, leastwise where authorized, may require that buildings on lots shall face the street that the lot faces * * *. It may be required that houses or other buildings front on streets and not alleys, and the requirement cannot be evaded by subterfuge, concealment or misnaming fronts, sides or rears." [1]

Such provisions are discussed and held valid in *Brous v. Smith* (N. Y.), 106 N. E. 2d 503, and *Mitchell v. Morris* (Cal. App.), 210 P. 2d 857, 859. In the last case, in reference to a provision that a lot was "a parcel of land * * * having frontage upon a street (other than an alley) * * *," the Court said: "* * * a more necessary regulation could hardly be imagined than one which forbids the erection and maintenance of a dwelling house in a modern city except where such dwelling has adequate and permanent access to a public street."

Princeton admits that its contemplated "right-of-way" is not a street. It makes no contention that a statutory requirement that every lot front on a public street would be invalid, and no claim that its proposed development has special status or rights under Section 25N of the Ordinance, dealing with garden type apartments. Our holding that the Ordinance requires every lot in a D area district to front on a public street of the minimum width required by the Ordinance, shows that Princeton's proposal is unlawful, and requires the denial of a building permit for the dwellings it planned to build, since Section 34 of the Ordinance (the Enforcement section) provides that the Building Inspection Engineer shall not issue any permit for the construction of any building unless the application therefor shows that there will be conformity in all respects with the provisions of the Ordinance.

*Order reversed, with costs.*

---

1. For some such unsuccessful instances, see Rollins v. Armstrong (N. Y.), 167 N. E. 466; Davis v. City of Abilene (Civ. App. Texas), 250 S. W. 2d 685; In re McInerney (Wyo.), 34 P. 2d 35. See also *Dinnick v. City of Toronto*, 3 D. L. R. 310, 311.

HENDERSON, J., filed the following opinion, dissenting in part, in which HORNEY, J., concurred.

I am disposed to agree with the majority of the Court on all the points discussed except the final one where it seems to be held that the Ordinance requires every house or lot in a development plan to front on a public street at least thirty feet wide. I think that conclusion is untenable and unsound.

There are procedural objections to the holding. I cannot find on the record that the point was raised below. Judge Cullen did not mention it in his opinion. In the resolution adopted by the Zoning Board, from which the appeal was taken, the Board did not indicate that the plan was defective because the dwellings proposed fronted on an interior court or utility right-of-way. On the contrary, it said: "Testimony was offered by an expert witness to show that the cul-de-sac type of street layout for a housing development is accepted as good planning practice. The Board is fully aware of this, but the subdivision plan for the property in question here is, in the judgment of the Board, not a good plan * * *." The Data Sheet, prepared for the Board by its staff, contained the notation: "In this appeal it appears that the bldgs. would front on the walk or right-of-way previously referred to, both being less than 30′ in width, therefore the front yard provisions do not apply." At the hearing before the Board, it was clearly brought out that the specific objections raised before Judge Oppenheimer had been corrected. Judge Oppenheimer had held that if the area occupied by the "utility right-of-way and walkway" were deducted from the area of five of the lots, these houses would cover slightly more than fifty per cent of the area and so violate the Ordinance. In so holding, he construed the term "alley" as used in the zoning law to include the proposed passage or way. He did not hold that the plan was unlawful because all of the houses fronted on an "alley".

At the hearing before the Board, Mr. Rogers, a recognized expert in zoning matters, testified that in his opinion, the minimum front yard setbacks in sections 26 and 27 of the Ordinance were inapplicable because the frontage was on a walkway, not on a street. It was brought out that the Planning Commission had approved the plan in the instant case,

and there had been no appeal, as authorized by the Charter (1949 ed.) § 120. This section was cited in *Windsor Hills Imp. Ass'n v. Mayor & C. C. of Baltimore,* 195 Md. 383, 393, in connection with a statement that the Zoning Board has no power to review the legality of the acts of the Planning Commission. See also *Feldman v. Star Homes, Inc.,* 199 Md. 1, 5. The provision for direct appeal would seem to negative the idea that the Commission's decisions are open to collateral attack.

In section 116 of the Charter the Planning Commission is authorized to formulate rules and regulations for the development of subdivisions. Regulation 6 (b), which was put in evidence below, provides: "All lots shall abut on a street *or common right of way.*" (Emphasis supplied.) The witness Rogers referred to several other housing developments in the City where approval had been given to building projects fronting upon a private way or central court. Section 48 (t) of the Ordinance, defines "Front or Frontage" as "That side of a lot abutting on a street *or way* and ordinarily regarded as the front of the lot * * *." (Emphasis supplied.) The decision of the majority in the instant case would seem to run counter to the express words of the Ordinance and the regulation of the Planning Commission.

The opinion notes that section 48 (c) of the Ordinance provides that "The term 'street' shall apply to any street thirty feet or over in width", whereas section 48 (d) provides that "The term 'alley' shall apply to any street less than thirty feet in width." Section 26 provides that front yards shall be required in all D area districts, and section 27 provides, with reference to "lots fronting on the side of a street, between two intersecting streets," where there are no existing buildings, that the minimum depths of front yards shall be governed "by the width of the street on which it abuts," according to an attached table. This table provides no minima for street widths of less than thirty feet. Mr. Lang, a member of the Planning Commission, testified at the first hearing before the Board that no specific front yard requirements had been set up by the Commission, or by the Building Engineer, where frontage was on a "way".

Because of the omission of the Ordinance to fix minima in the case of streets less than thirty feet in width, the opinion seems to draw the inference that buildings not fronting on such a street are forbidden. I think the inference is unwarranted. The accepted rule is that one is entitled to use his property as he sees fit, unless restricted by statute or ordinance under the police power, so long as the use does not constitute a nuisance. Cf. *Feldman v. Star Homes, Inc., supra* at p. 6. Restrictions upon use should not be left to implication. The legislative omission may well have been deliberate. Other provisions, such as the area restrictions and those requiring approval by the Planning Commission, may have been thought adequate. As I read the opinion in the instant case, even if provision had been made for a thirty-foot utility right-of-way and walkway, and twenty-five foot front yards, which would be perfectly legal if the way had been dedicated to public use and accepted by the City, the plan would still be illegal because the houses would not front on a public street. Since the width of the tract will not permit such a layout, apparently the owners are restricted to the erection of houses on Mayfield Avenue. Quite apart from the hardship to the owners, I think the decision unduly restricts the discretion of the Planning Commission to approve plans which exclude vehicular traffic and provide for off-street parking, as this plan did.

Judge Horney authorizes me to say that he agrees with the views here expressed.