837 A.2d 1059

**BOARD OF COUNTY COMMISSIONERS FOR ST. MARY'S COUNTY**

v.

**SOUTHERN RESOURCES MANAGEMENT, INC., et al.**

No. 2687, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 10, 2003.

12

14

Linda Springrose, Leonardtown, for Appellant.

Gorman E. Getty, III (Britt, Getty Law Offices on the brief), Cumberland, for Appellee.

Argued Before JAMES R. EYLER, BARBERA, and
CHARLES E. MOYLAN, Jr. (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

This case arises out of an effort by Southern Resources Management, Inc. and Robert Gollahon (hereinafter both will be referred to as Gollahon), appellees and cross appellants, to obtain subdivision approval [1] for a 792.84 parcel of land zoned "rural preservation district," located in St. Mary's County (hereinafter the Property). On February 28, 2000, the St. Mary's County Planning Commission (hereinafter the Planning Commission) approved the subdivision plan for section 1, phase 1, which proposed five fifteen acre lots on a total of 76.67 acres, and approved the phasing plan for the remainder of the Property. The approval for section 1, phase 1 was final and permitted development to go forward, subject to appeal, but the approval of the phasing plan was not a final subdivision approval.

The St. Mary's County Board of County Commissioners (hereinafter the County Commissioners), appellant and cross appellee, and the St. Mary's County Health Department (hereinafter Health Department) appealed to the St. Mary's County Board of Appeals (hereinafter the Board). On February 5, 2001, the Board reversed the Planning Commission's approval. Thereafter, Gollahon filed a petition for judicial review in the Circuit Court for St. Mary's County. On January 13, 2003, the circuit court reversed the Board. The County Commissioners appealed to this Court.

We agree with the circuit court that the Board's decision cannot be affirmed, but we disagree with the court's disposition. Consequently, we shall reverse the judgment of the circuit court, vacate the decision of the Board, and remand the case to the Board for further proceedings consistent with this opinion.

---

1. The proposed subdivision is known as the McIntosh subdivision.

**16**

## Factual Background

In the 1950's, the Property was owned by Hunter Chemical Corporation and Federal Ordnance Corporation, which manufactured and tested ordnance for the United States Navy from 1952 to 1956. The ordnance included items known as detonators, igniters, fuse boosters, and similar items containing relatively small amounts of explosives, used to detonate munitions. Approximately 100 acres of the Property were used in the manufacturing process. The companies buried unwanted live ordnance on the property as a means of disposing of it.

In 1959, Thiokol Chemical Corporation (hereinafter Thiokol)[2] purchased the Property. In 1966 and 1967, Thiokol performed an investigation of the site, located three burial sites, and removed ordnance. Documents indicate, however, that even after this removal process, Thiokol believed that live ordnance remained on the Property.

In the early 1980's, all buildings on the Property were razed. In 1984, the Property was placed on the State's List of Potential Hazardous Waste Sites so that it could be evaluated. In 1985, the Maryland Department of the Environment (MDE) conducted a preliminary assessment and determined that the site was a low priority for investigation. In 1989, NUS Corporation performed an assessment of the Property for the Environmental Protection Agency (EPA). The NUS Corporation described chemicals found on the site, indicated that they did not pose significant health or environmental concerns, but also stated that the "greatest concern" was the reported burial of shock sensitive explosives. As a result, it recommended against activities that would disturb the soil or cause shocks to the ground. The EPA listed the site as "no further remedial action planned." In this same time frame, International Technology Corporation also investigated the Property, apparently on behalf of Thiokol.

---

**2.** At some point, Thiokol changed its name to Cordant Technologies, Inc. or conveyed the Property to Cordant, an affiliated company. For ease of reference, we shall refer to the entities as Thiokol.

In 1991, Thiokol decided to pursue remedial action, and a work plan was developed. According to a Thiokol report, Thiokol conducted a historical analysis, surveyed and removed all surface debris, used three geophysical methods [3] to locate any buried debris, employed a consultant to intensively explore the sites identified by the surveys, and excavated the sites with the approval of the MDE and the office of the State Fire Marshal (Fire Marshal). The surveys were performed by Geophex, Ltd., and the ordnance was removed by Human Factors Applications, Inc. (HFA). Ninety six priority sites were identified through use of the surveys, by considering the information obtained in the historical investigation, and by considering the location of the former buildings. During investigation of the sites, HFA recovered detonators, flash tubes, boosters, powder rings, igniters, and squibs. A total of 1,360 pounds of material, the same as or similar to the type described above, were recovered and destroyed. In June, 1995, after the remediation was completed, Thiokol issued a report, and the report was placed in the St. Mary's County Public Library.

In January, 1999, Gollahon purchased the Property with the intent of developing a residential subdivision. Prior to the sale, Thiokol recorded a declaration of covenants among the land records, prohibiting construction on a substantial number of acres, the area where manufacturing had occurred. In early 1999, Gollahon moved ahead with his subdivision plans. In June, MDE expressed concern regarding the potential hazard of buried ordnance. MDE reviewed HFA documents and determined that HFA believed that not all sites investigated by it had been completely cleaned. HFA also advised that the surveys used might not be able to detect small amounts of ordnance and had "hit or miss capabilities."

Thiokol became re-involved and contracted with Apex Environmental, Inc. (Apex) and UXB International, Inc. (UXB) to perform additional remediation. Apex and UXB developed

---

3. A combination of magnetic, electromagnetic, and ground-penetrating radar was used.

work plans in conjunction with MDE and the Fire Marshal. Ten sites, totaling 22.4 acres, were identified to be explored. The work plans were approved by MDE and the Fire Marshal, and the plans were determined to be in conformance with United States Army Corps of Engineers and Department of Defense standards.

According to Apex's final report dated June 30, 2000, approximately 16,000 detonators were recovered, plus small quantities of blasting caps, boosters, detonator fuses, flash tubes, and squibs. Also recovered were .5 pounds of raw propellant, .8 pounds of military dynamite, and 2.5 inert rocket warheads. In all, approximately 82 pounds of material was recovered with a net explosive weight of approximately 11 pounds. In addition, 218 tons of soil containing an estimated 3.5 to 10.4 pounds of detonators were removed from the property.

By letter dated November 23, 1999, the Fire Marshal advised Thiokol that the work plan had been completed in accordance with the work plan approved by that office, and by letter dated December 3, 1999, MDE advised Thiokol that, for the areas sampled, "no significant chemical contamination exists above acceptable risk levels". The letter further stated that once the ordnance investigation is completed, it would issue a final determination.

At some point in 1999, Gollahon applied to St. Mary's County Department of Planning and Zoning[4] for subdivision approval. Gollahon divided the Property into two sections. Section 1, phase 1 consisted of 76.74 acres, and section 2 consisted of the remaining 716.16 acres.

On February 28, 2000, the Planning Commission granted final approval for section 1, phase 1 and granted approval for the phasing plan for section 2. Robert Gollahon, John B. Norris, Jr., with NG & O Engineering, Inc., Vince DiRenzo, with Apex, and Hugh Sease, with UXB, testified in support of

---

4. The name of the Department has since been changed to the Department of Land Use and Ground Management.

the application. The first paragraph of the minutes of the February 28 meeting states:

> Ms. Grover stated that all agencies have issued final approvals with regard to Section 1, and there are no outstanding issues. Staff recommends approval. However, regarding the Phasing Plan for Section 2, there has been an ongoing cleanup of residual contamination from detonators previously manufactured on site by the Hunter Manufacturing Company. Applicant states cleanup has proceeded to the point where the site has deemed to be 'clean' except for one large pile of dirt. However, in the absence of a final determination from MDE and in view of the number of outstanding issues on this section, including site access, staff recommends the Commission defer decision on the phasing plan until all outstanding issues are resolved.

The minutes inform us that Gollahon advised the Planning Commission that the areas of concern with respect to ordnance were contained in the area used for manufacturing, the area restricted by the declaration of covenants. Mr. DiRenzo reported on the cleanup of the site. Detonators were discussed, and Mr. DiRenzo stated they were small and would not inflict injury. Ms. Ann Rose, Director of Environmental Health, stated that, to the contrary, she was advised by a representative of UXP that detonators could cause injury. A representative of the Fire Marshal's office advised that the Fire Marshal was merely certifying that the work plan had been completed and was not certifying the site as safe for residential construction.

The County Commissioners and the Health Department requested the Planning Commission to reconsider its decision. The Planning Commission denied the request, and the County Commissioners and the Health Department appealed to the Board.

The Board held evidentiary hearings on July 13, 2000, August 24, 2000, December 4, 2000, and December 7, 2000. The Board also held a work session on July 24, 2000. That session was not recorded, and no minutes were kept.

In addition to receiving documentary evidence, the Board heard testimony from several witnesses, which we shall summarize in very general terms. Jon R. Grimm, Director of the Department of Planning and Zoning, presented documentary information and summarized the staff's position, similar to what had been done before the Planning Commission. John Norris and Vince DiRenzo testified on behalf of Gollahon. Mr. Norris' testimony appeared to be similar to that presented to the Planning Commission. Mr. DiRenzo reviewed the remediation process from when Thiokol purchased the Property through issuance of Apex's final report. He testified that, at the time of the February 28, 2000 hearing before the Planning Commission, there was a 400 ton pile of dirt that the Fire Marshal wanted removed and the Planning Commission wanted removed, and that had been done. He also testified that Apex's final report was filed after the Planning Commission's decision. On cross-examination, Mr. DiRenzo acknowledged that the Planning Commission had not been informed with respect to all of the items found in 1999 but explained that they had emphasized those items which were of the greatest concern.

Karl Kalbacher, a representative of MDE, testified on behalf of the County Commissioners. He explained that MDE was primarily concerned with hazardous substances and was only concerned with particular portions of the Property, being the areas previously determined to contain ordnance. Mr. Kalbacher acknowledged that the investigation and clean up had been completed to MDE's satisfaction.

Mr. Hugh Sease, a representative of UXB, also testified on behalf of the County Commissioners. He testified that the Property was safe because UXB covered the sites thoroughly and the ordnance was insensitive to shock. He acknowledged that UXB was only involved with remediation of certain sites and not the whole Property. In other words, UXB did not redo the earlier surveys which identified those areas where ordnance had been buried, i.e., the manufacturing area. He also acknowledged that complete information with respect to

the items found by UXB had not been given to the Planning Commission.

The final witness for the County Commissioners was Wayne Lewallen, the vice-president of Explosive Ordinance Technologies. Mr. Lewallen had 20 years' experience in explosive ordnance remediation and testified as an expert witness. Mr. Lewallen read the historical documents, at least some of the exhibits before the Board, and listened to at least some of the testimony before the Board. He opined that the historical documents showed the presence of dangerous ordnance and that the remediation efforts were inadequate.

Gollahon called Mr. Sease and Mr. DiRenzo in rebuttal. Both witnesses defended the remediation efforts as appropriate, in compliance with applicable standards, and adequate.

On February 5, 2001, the Board issued an opinion and order in which it reversed the Planning Commission's decision and denied Gollahon's request for approval of the section 1, phase 1 subdivision plan and the phasing plan for the remainder of the proposed subdivision.

The Board's opinion contained the following. First, the Board observed that it had appellate jurisdiction pursuant to Md.Code art. 66B, section 4.07(d)(1), and that the matter was properly before it. Second, the Board determined that the County Commissioners and the Health Department had standing to appeal the Planning Commission's decision pursuant to art. 66B, section 4.07(f).

Last, the Board addressed whether there was an error in the Planning Commission's decision. The Board, observing that public safety was a valid consideration, concluded that the Planning Commission erred in approving the phasing plan without adequately addressing whether the Property was safe for residential use, and also determined that the section 1, phase 1 plan was not severable from the phasing plan. The Board referred to the "lack of continuity between the various contractors hired to 'clean'" the Property, and the "conflicting information as to the status of the 'clean-up' efforts," and the testimony of Hugh Sease, an employee of UXB, who "admitted

that the cleanup process was not as thorough as should be expected or as is needed for the residential development" of the Property. The Board concluded that Gollahon had not adequately addressed the potential existence of ordnance on the Property.

On February 22, 2001, Gollahon filed a petition for judicial review. The circuit court held hearings on February 1, 2002, and January 13, 2003, and on the latter date, issued an opinion and order. The court reversed the Board's decision and reinstated the Planning Commission's decision.[5]

Because we perform the same function as the circuit court, it is not necessary to summarize the court's opinion in detail. It is necessary to summarize the court's holdings, however, in order to understand the issues presented on appeal. The court held (1) the Board was within its jurisdiction in addressing potential harm to public safety; (2) the Fire Marshal had a responsibility to determine safety, and the burden was not solely on Gollahon; (3) the Board erred in conducting a pure *de novo* review; (4) the notices of appeal to the Board were deficient because of lack of specificity, and the Board should have dismissed the appeal; (5) the Board erred in imposing a 100% certainty standard; and (6) the evidence was insufficient to support the Board's conclusion.

### Questions Presented

The questions raised by the County Commissioners, as slightly rephrased by us, are:

1. Did the circuit court err in ruling that the Board should have dismissed the case due to deficient notices of appeal?

2. Did the circuit court err in holding that the Board used an incorrect standard in reviewing the Planning Commission's decision?

---

5. The court's opinion and order resolved all issues, but a separate order was not signed and docketed. On May 8, 2003, a separate order dated January 13, 2003 was docketed. Presumably, the latter order was entered to comply with Rule 2–601. The notice of appeal to this Court, even if filed prematurely, is saved by Rule 8–602(d).

3. Did the circuit court err in its determination of the scope of responsibility of the Office of Fire Marshal with respect to the Property?

4. Did the circuit court err in holding that the Board acted arbitrarily and capriciously?

Gollahon raises the following question, as rephrased by us:

Did the circuit court err in holding that the Board had authority to determine potential harm to public safety when the application otherwise met the requirements of the subdivision ordinance?

### Judicial Standard of Review

When more than one administrative entity is involved in the decision process, it is the final decision that we review. *Dept. of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 301–02, 641 A.2d 899 (1994). In the case before us, that is the Board's decision.

In *Hikmat v. Howard County,* 148 Md.App. 502, 522–23, 813 A.2d 306 (2002), this Court set out the three part analysis an appellate court must engage in when reviewing an administrative board's decision:

1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order is premised solely upon an erroneous conclusion of law.

2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, i.e., by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. At this junction, ... it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference.

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is whether a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles.]

(Citations and quotations omitted).

The Court of Appeals recently expanded upon the discussion of an appellate court's review of an agency's application of the law to the facts in *Lewis v. Dept. of Natural Resources,* 377 Md. 382, 405–08, 833 A.2d 563 (2003)(quoting *Stansbury v. Jones,* 372 Md. 172, 182–85, 812 A.2d 312 (2002)):

Almost a half-century ago, in a case involving a denial of a use permit, we stated: "It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board." *Dorsey Enterprises, Inc. v. Shpak,* 219 Md. 16, 23, 147 A.2d 853 (1959). Chief Judge Hammond wrote for the Court in *State Ins. Comm'r v. National Bureau of Casualty Underwriters,* 248 Md. 292, 309, 236 A.2d 282 (1967), that "under ... [either] of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. (alteration added).'

Whether reasoning minds could reasonably reach a conclusion from facts in the record is the essential test. If such a conclusion is sufficiently supported by the evidence, then it is based upon substantial evidence. Forty years ago in *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 447–48, 168 A.2d 390 (1961), we noted that:

The substantial evidence test "means that the reviewing court's inquiry is whether on the record the agency could reasonably make the finding." ... Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The heart of

the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. "The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." [Citation omitted.]

. . .

Nonetheless, we have also indicated in our cases that *where an administrative agency's conclusions are not supported by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence, such decisions are due no deference.* In *Belvoir Farms Homeowners Association, Inc. v. North*, 355 Md. 259, 267–68, 734 A.2d 227 (1999), we stated:

Generally, *a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law. Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 569, 709 A.2d 749 (1998) ("We may reverse an administrative decision premised on erroneous legal conclusions." (citing *People's Counsel v. Maryland Marine Mfg. Co.*, 316 Md. 491, 497, 560 A.2d 32 (1989))).

*In Maryland Marine Mfg., supra*, 316 Md. at 496–97, 560 A.2d 32, we said:

As we have frequently indicated, the order of an administrative agency must be upheld on judicial review if it is not based on an error of law, *and if the agency's conclusions reasonably may be based upon the facts proven.* But a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law. [Citation omitted.] [Emphasis added.]

In sum, we review the instant case to ensure, first, that the Board applied the correct legal standard in making its determination, and second, that the Board's conclusion was sufficiently supported by the evidence. Where either an incorrect legal standard is used or the Board's conclusion is not sufficiently supported by the evidence, the decision is considered arbitrary and capricious and, therefore, must be reversed. *Lewis*, 377 Md. at 408, 833 A.2d 563.

## Discussion

### *Adequacy of Notices of Appeal*

The procedure for appealing a decision of the Planning Commission to the Board is set forth in St. Mary's County Zoning Ordinance, No. 90–11 (1990), Art. VI, § 66.1.1,[6] as follows:

> An appeal may be taken to the Board of Appeals by any person, firm, or corporation aggrieved by a decision of the Planning Director or designee or by any officer, department, board or bureau affected by a decision of the Planning Director or designee. Such appeal shall be taken within 30 days of the date of the decision by the Planning Director by filing with the board a notice of appeal specifying the grounds thereof. The Planning Director or designee shall forthwith transmit to the board all of the papers constituting a record upon which the action appealed from was taken.

This section of the St. Mary's County Zoning Ordinance is derived from Md.Code Ann., Art. 66B, § 4.07(e)(2)(2000), which states:

---

6. The St. Mary's County Zoning Ordinance has since been superseded by the St. Mary's County Comprehensive Zoning Ordinance No. 02–01 effective May 13, 2002. The corresponding section is 23.1.2, which provides: "Such appeal shall be taken within 30 days of the date of the action being appealed by filing an application for Board of Appeals review with the Department of Planning and Zoning. An application for appeal shall identify with specificity all grounds for the appeal." The parties agree that section 66.1.1 of the previous zoning ordinance controls the issue in this case, and the notices of appeal expressly relied on that section.

An appeal shall be taken within a reasonable time, as provided by the rules of the board of appeals, by filing with the administrative officer from whom the appeal is taken and with the board of appeals a notice of appeal specifying the grounds of the appeal.

Article 66B, section 4.07(d)(1) provides that the Board may hear and decide appeals where it is alleged "there is an error in any order, requirement, decision, or determination made by administrative officer...." St. Mary's Zoning Ordinance section 66.00.4a is to the same effect.

The notice of appeal filed by the County Commissioners stated that the basis of the appeal was "error in the order, requirement, decision or determination made by the Planning Commission" with respect to Gollahon's application. The notice filed by the Health Department stated: "Testimony for the applicant on February 28, 2000, described discovery of detonators with minimal net explosive weight. Subsequent inspection of public information files described in testimony on behalf of the applicant reveal that numerous types of ordnance with exponentially greater net explosive weight have been discovered in previous site investigations. Similar items have been recovered in the current investigation."

The circuit court relied on *Norwood Heights Improvement Assn., Inc. v. Mayor and City Council of Baltimore*, for the proposition that a party seeking to appeal the decision of the Planning Commission "must set out specifically the fact which he contends is a violation of a particular paragraph of the Ordinance, otherwise he has set out no cause whatever." 195 Md. 1, 7, 72 A.2d 1 (1950). As the County Commissioners correctly point out, however, "[t]he statutory language cited in *Norwood Heights* no longer appears in Article 66B"; thus specific facts are no longer required to support alleged violations by the Planning Commission. In addition, *Norwood Heights* dealt with a Baltimore City Zoning Ordinance where an appeal was sought after building permits issued. The Court dismissed the appeal because "the appellant had no authority under the statute to appeal," rather than because

facts were not set forth. *Id.* at 8, 72 A.2d 1. As the circuit court noted, the Court in *Norwood Heights* observed that, under the Baltimore City ordinance, the notice of appeal had to include factual allegations showing how the ordinance was violated. *Id.* at 7, 72 A.2d 1.

Appellee cites a subsequent *Norwood Heights* case for the proposition that the notices in this case were deficient. *See Norwood Heights Improvement Assn., Inc. v. Mayor and City Council of Baltimore*, 195 Md. 368, 73 A.2d 529 (1950). In this later decision, the same parties brought a similar dispute before the Court. *Id.* at 372, 73 A.2d 529. The Court cited the earlier decision and dismissed the appeal. *Id.* at 373, 73 A.2d 529. Again, the party seeking the appeal was not a party authorized to appeal under the statute, so the petition was dismissed. *Id.* More important for present purposes, however, is that the above cases were decided under a Baltimore City ordinance and prior to the amendment of the language in article 66B, referenced above.

The County Commissioners virtually concede their notice was deficient but argue the Health Department's notice was sufficient without explaining why that would enable the County Commissioners to orchestrate the opposition of the opponents to Gollahon's application. In our view, the County Commissioner's notice was probably deficient while the Health Department's notice was probably sufficient. We need not decide that, however, because a deficiency in the notice of appeal does not necessarily require dismissal of the appeal. Assuming the notice or notices in this case were deficient, there is no statute, ordinance, or rule requiring the Board to dismiss the County Commissioners' appeal.

■ An administrative proceeding is subject to the requirements of due process. This includes an adequate formulation and notice of the issues in the case. *Boehm v. Anne Arundel County*, 54 Md.App. 497, 511, 459 A.2d 590 (1983). Generally, a notice of appeal, in the judicial context, is not required to contain specifics, but the formulation of issues and adequate notice is addressed and governed by other requirements.

Generally, such other requirements are not present in the administrative context. Thus, the notice of appeal is required to specify grounds.

An agency has discretion, as long as it does not change the nature of the original proceeding, violate due process, act arbitrarily, or run afoul of some legislative or self imposed requirement. *Hikmat,* 148 Md.App. at 531 n. 10, 813 A.2d 306.

An administrative agency, exercising appellate jurisdiction, must, through some procedure, satisfy fairness requirements. Whether an appeal is on the record, substantially *de novo,* or purely *de novo,* the agency must determine the issue or issues being heard and decided. Even in a purely *de novo* appeal, only those matters appealed are heard and decided, not every matter that was involved in the underlying application. *Halle Companies v. Crofton Civic Assn.,* 339 Md. 131, 140–49, 661 A.2d 682 (1995); *Daihl v. Board of Appeals of Baltimore County,* 258 Md. 157, 162–64, 265 A.2d 227 (1970). An orderly disposition requires specificity of the portion of the adverse ruling which is being challenged by the aggrieved party. *Daihl,* 258 Md. at 164, 265 A.2d 227.[7]

The County Commissioners, before the Board, took the position that all conceivable issues were being appealed. The Board clearly was feeling its way, and the procedure could have been more orderly. The transcript reveals that the Board formulated its process and procedure as the hearing

---

7. In *Daihl,* the issue was different from the issue under discussion because the ordinance in *Daihl* provided that the board would hear zoning appeals de novo "upon the issues," a standard of review provision. The relevant language in the case before us provides for an appeal from the "decision." Art. 66B section 4.07(d)(1). As discussed below, there is no ordinance in St. Mary's County or Board rule that expressly addresses the Board's standard of review. Despite the more specific language in a different but analogous context, we believe *Daihl* is authority for the proposition that issues to be quasi-adjudicated need to be identified at a time and in a manner that provides notice to all parties sufficient to enable them to present evidence and argument. We do not think it stands for the proposition that, if the issues are not specified in the notice of appeal, the appeal must be dismissed.

progressed. The County Commissioners refused to be pinned down to specific issues, the Board did not require it, and ultimately concluded that it was sitting as a "super Planning Commission." Nevertheless, assuming the County Commissioners' notice was deficient, and assuming that the Board should have required a formal delineation of issues, all parties understood, relatively early in the proceedings, that safety related to the historical presence of ordnance, was the only significant issue. There is no contention that evidence was excluded based on inadequacy of the notices of appeal, and there is no contention that evidence was admitted that should have been excluded. The Board's decision reflects the evidence and arguments in that it addresses only the safety issue with the exception of one sentence. In that sentence, the Board found that the Planning Commission had not erred in determining that adequate facilities existed to serve the proposed subdivision. The Board proceeded de novo but everyone understood, as stated, that safety was the contested issue being reviewed under that standard.

### Board's Standard of Review

Citing *Hikmat v. Howard County, supra,* 148 Md.App. 502, 813 A.2d 306, where this Court held that "the administrative standard of review 'is not a purely *de novo* proceeding,'" the circuit court found that the Board erred in conducting a *de novo* review and reversed the Board's decision. The circuit court was incorrect in finding that *Hikmat* controls the Board's standard of review in this case. The *Hikmat* decision was based on an interpretation of the charter for Howard County, Howard County ordinances, and the enabling statute for charter counties, Md.Code, Art. 25A. *Hikmat,* 148 Md. App. at 523, 813 A.2d 306.

■ St Mary's is a commissioner county, and as such, it is not governed by Md.Code, Art. 25 A, but rather, Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 25. The land use provisions for such counties are contained in Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B. *See Mayor & Council of Rockville v. Rylyns Enters.,* 372 Md. 514,

528, 814 A.2d 469 (2002). Article 66B specifically authorizes the establishment of a Board of Appeals as an administrative body created to "[h]ear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative officer in the enforcement of this article or of any ordinance adopted under this article." Md.Code, Art. 66B, § 4.07(d). The Board's standard of review is not directly addressed in Article 66B, but § 4.07(h)(2) provides the Board with all the powers of the administrative officer when the case is on appeal.

The Board, by statute, was given broad powers, its standard of appellate review was not restricted by statute, and it was not restricted by ordinance or rule. Consequently, unlike the Board in *Hikmat*, the Board's review was appropriately *de novo* with respect to the issue being contested. *Boehm*, 54 Md.App. at 506–11, 459 A.2d 590. All parties participated in the proceedings with that understanding.

### Responsibility of Fire Marshal

Md.Code (2000), Art. 38A, § 8 sets forth the powers and duties of the Fire Marshal. In general, the Fire Marshall has the power to enforce laws related to fire prevention and potential fires. This includes "[t]he storage, sale, and use of any explosive, combustible, or other dangerous article ...," installation and maintenance of fire safety equipment and fire exits, and the suppression of arson. Md.Code (2000), Art. 38A, § 8(a).

Also under § 8 of the Code, the Fire Marshal shall assist other agencies in fire prevention matters when requested, enforce regulations, conduct inspections of designated types of properties,[8] and report findings. The Fire Marshal may conduct investigations of any fire or explosion or an attempt to cause any fire or explosion. The Fire Marshall has additional

---

8. Md.Code (2000), Art. 38A, § 8(d) provides: "The State Fire Marshal shall inspect all State, county, and municipally owned institutions, all schools, theaters, churches and other places of public assembly as to fire exits and reasonable safety standards and report his findings and recommendations to the proper administrative heads."

duties related to state owned property. Md.Code (2000), Art. 38A, § 8(n).

Under Md.Code, Art. 38A § 12 (2000), titled "Additional remedies to abate, etc., fire hazards," the Fire Marshal is granted further authority. This section provides:

> In case ... any land is or is proposed to be used in such a way to endanger life or property from the hazards of fire or explosion ... the State Fire Prevention Commission, the State Fire Marshal, or the Attorney General may, in addition to other remedies provided by law, institute injunction, mandamus, abatement, or any other appropriate action or actions, proceedings to prevent, enjoin, abate, or remove such unlawful erection, construction, reconstruction, alteration, maintenance or use.

*Id.*

The County Commissioners argue that the circuit court overstated the Fire Marshal's powers and responsibilities and, in effect, put too much reliance on the Fire Marshal's approval of remediation efforts in holding that the Board acted arbitrarily and capriciously. The County Commissioners argue that the statutory language gives the Fire Marshal permissive, rather than mandatory, powers and duties related to the Property, allowing but not requiring the Fire Marshal to inspect the property.

Because we review the Board's decision, it is immaterial whether the circuit court overstated the Fire Marshal's responsibilities. As discussed below, the issue of safety was within the Board's jurisdiction to consider. There is nothing in the Board's opinion to indicate that it misconstrued the powers of the Fire Marshal. The conclusions of the Fire Marshal and MDE were not determinative in the sense of preventing further inquiry into safety, but Gollahon was entitled to have the Board consider the evidence relating to their involvement along with all the other evidence presented.

### Arbitrary and Capricious

Our review indicates that the Board committed several errors. First, the Board applied an arbitrary standard in

requiring 100% certainty. Second, the Board erred in failing to provide specific findings to explain why it was not convinced the Property was safe. Finally, while the record contains evidence to support a decision not to affirm the Planning Commission's decision, the evidence was insufficient to conclusively determine that the property was unsafe and, thus, insufficient to reverse the Planning Commission without further proceedings. Thus, we will reverse the decision of the circuit court and order it to remand the case to the Board for reconsideration in light of this opinion.

## A. Arbitrary Standard

In reaching its conclusion, the Board used a 100% certainty standard and determined that Gollahon did not adequately prove that the Property was suitable for residential development. During the hearing before the Board, the Chairman of the Board stated: "I would not be willing to allow anyone to build a house on [the Property] until I was 100 percent sure there was nothing buried on that piece of property." He continued, and stated that "because of the overt nature and history of this property that there be 100 percent certainty that all of those explosives had been removed prior to putting a single house on that piece of property." The other Board members expressly agreed with the certainty standard (two Board members agreed with the chairman's statements; the fourth stated "not a certainty yet that it's a safe place"; and the fifth stated "no one has told me yet that they can guarantee that the place is definitely safe for people to live in").

The 100% certainty standard was arbitrary because it is impossible to demonstrate, based on a 100% certainty requirement, that any parcel of land is completely safe. Therefore, by applying an incorrect standard, the Board's decision was arbitrary and capricious. *See Forman,* 332 Md. at 219–220, 630 A.2d 753 (setting forth the grounds for reversal of an agency decision). The correct standard is whether the evidence supports a finding of unreasonable risk and, if so, whether it could be ameliorated.

 "[W]here an administrative agency renders a decision based on an error of law, we owe the agency's decision no deference." *Lewis*, 377 Md. at 435, 833 A.2d 563 (citation omitted). Because the Board clearly applied an incorrect legal standard, we are not bound by its opinion. Nevertheless, when an administrative agency renders a decision based on incorrect legal standards, but there exists some evidence, "however minimal, that could be considered appropriately under the correct standard, the case should be remanded so the agency can reconsider the evidence using the correct standard." *Id.* at 435, 833 A.2d 563 (quoting *Belvoir Farms Homeowners Ass'n*, 355 Md. at 271, 734 A.2d 227).

## B. Findings of Fact

 In order to determine whether sufficient evidence existed to allow the Board to render a decision under a correct legal standard, we turn to the factual findings provided by the Board. As an administrative board, the Board is required to issue findings of fact and conclusions of law in support of its opinion. *See Mehrling v. Nationwide Ins. Co.*, 371 Md. 40, 62–63, 806 A.2d 662 (2002)(noting that "administrative agencies are required to resolve all significant conflicts in the evidence and then chronicle, in the record, full, complete and detailed findings of fact and conclusions of law." (quoting *Forman v. Motor Vehicle Admin.*, 332 Md. 201, 221, 630 A.2d 753 (1993))). The Court of Appeals further specified that "findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Mehrling*, 371 Md. at 62–63, 806 A.2d 662 (quoting *Bucktail v. Talbot County*, 352 Md. 530, 553, 723 A.2d 440 (1999)). The purpose of the findings requirement is threefold: (1) requiring an articulation of the reasoning process makes the decision-maker accountable to the public; (2) it allows the injured party to understand the reasons behind the agency's decision; and (3) most important, the findings requirement assists in facilitating judicial review of the agency's decision. *Sweeney v. Montgomery County*, 107 Md.App. 187, 197, 667 A.2d 922 (1995)(citing *Baltimore Gas and Electric Co.*

*v. Public Service Commission,* 75 Md.App. 87, 540 A.2d 820 (1988)).

 With regard to the issue of judicial review, the Court of Appeals has explained that in order to determine whether the Board's decision was arbitrary and capricious, the reviewing court must have an understanding of the findings of fact on all material issues. *Mehrling,* 371 Md. at 62–63, 806 A.2d 662 (quoting *Forman,* 332 Md. at 220–21, 630 A.2d 753). "At a minimum, one must be able to discern from the record the facts found, the law applied, and the relationship between the two . . . ." *Id.*

In the instant case, our review of the Board's decision is hindered because the Board failed to make specific findings of fact regarding why it was not convinced the Property was safe. In holding that the Planning Commission erred in approving the phasing plan without adequately addressing whether the Property was safe for residential use, the Board set out a vague discussion of some of its concerns regarding the Property and then simply concluded that Gollahon had not adequately addressed the potential existence of ordnance on the Property.

The Board made no specific findings with regard to what portions of the property it believed might be unsafe or any specifics about which evidence it found to be credible. The Board did not indicate whether it believed the original surveys of the Property or the historical analysis to narrow the areas for intensive investigation were defective, whether the work plans in 1992 and 1999 were deficient, or whether they were improperly executed. We do not know if the Board believed that ordnance might be on areas proposed for development or rather that the concern was with access to the area restricted from development. The effect of the lack of findings is magnified because, as earlier discussed, the proceedings evolved, and it was never made clear to Gollahon what specific area or areas were of particular concern.

The difficulty in understanding the Board's reasoning is highlighted by the fact that the Board concluded that the

Planning Commission erred in approving the *phasing plan* without adequately addressing safety. Despite that conclusion, the Board also reversed the Planning Commission's decision approving section 1, phase 1. It is impossible to tell whether the Board was not convinced as to safety with respect to the entire tract, or whether the section 1 phase 1 subdivision plan and the phasing plan were lumped together for some other reason. In either event, it is not clear whether it was for a reason that could be addressed by Gollahon.

 Failure to provide specific findings of fact constitutes a legal error and prevents us from fully understanding the Board's decision. *See Lewis,* 377 Md. at 434, 833 A.2d 563 (2003)(noting that the Board should have issued specific findings of fact when it issued its opinion, and its failure to do so constituted legal error); *Mehrling,* 371 Md. at 62–63, 806 A.2d 662. In addition, it constitutes an error of law and renders the Board's decision arbitrary and capricious. *Lewis,* 377 Md. at 408, 833 A.2d 563 (stating that application of the incorrect legal standard renders a decision arbitrary and capricious).

## C. Sufficiency of the Evidence

We turn to the evidence provided in the record to determine whether it is sufficient to remand the case to the Board for reconsideration, without more, under the appropriate legal standard, and to issue a new opinion with specific findings. We conclude that it is not sufficient to support a reversal of the Planning Commission, as distinguished from other relief.

The evidence presented to the Board was sufficient to support a conclusion, under a non-arbitrary standard, that the Planning Commission erred in approving the phasing plan. Without weighing the evidence other than in a relative sense, the evidence with respect to section 1 phase 1 is of less weight than that relating to the phasing plan. We cannot say, however, without greater understanding of the Board's reasoning and findings as to potential location of ordnance and the danger of any such ordnance as it relates to section 1, phase 1, that the evidence was insufficient to permit the Board

to deny approval. *See Snowden*, 224 Md. at 447–48, 168 A.2d 390 (noting that a conclusion is reasonable and based on substantial evidence when it is sufficiently supported by the evidence).

With respect to the evidence generally, the Board noted there was a "lack of continuity between the various contractors hired to 'clean' " the Property, and there was "conflicting information as to the status of the 'clean-up' efforts." The Board cited the testimony of Hugh Sease, an employee of UXB, who "admitted that the cleanup process was not as thorough as should be expected or as is needed for the residential development" of the Property.

The testimony focused on the remediation efforts in the areas identified as having contained ordnance, particularly the 22.4 acres that was the subject of the most recent remediation efforts. Because there was less information presented about how the original surveys identified those areas, the Board could reasonably require more information to determine their effectiveness. In addition, it appears the early remediation efforts were primarily concerned with chemical contamination. The MDE and the Fire Marshal emphasized the limitations on their duties and responsibilities. There may be uncertainty with respect to the location of proposed lots and roads in relationship to where ordnance was found. There is a question whether any existing ordnance can cause injury and, if so, under what circumstances.

Based on this evidence, the Board could reasonably conclude that the Planning Commission should not have approved the Property for residential use. *See State Ins. Comm'r v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309, 236 A.2d 282 (1967)("a reasoning mind reasonably could have reached the factual conclusion the agency reached.").

■ We hold, however, that although the evidence is sufficient to justify the Board's refusal to affirm the Planning Commission's decision, it was legally insufficient to support an outright reversal of that decision. In other words, the evidence is sufficient to raise questions regarding the safety of

the Property, but insufficient to support a conclusion that the Property is unsafe. As previously stated, the Board found only that it was not convinced the Property was safe and did not find the Property was unsafe. The evidence is insufficient to support the latter finding, if made. Evidence was introduced that all agencies involved in analyzing the Property issued final approvals with regard to remediation efforts. There was no evidence presented specifically indicating that the Property remained unsafe. There was only the opinion expressed by Mr. Lewallen which was general and unsupported by specific facts.

In other words, the evidence indicated that at one time there was ordnance on some portion of the Property which at some point in time was dangerous. The evidence also indicates that a substantial effort was made to identify the location of ordnance and substantial remediation efforts were undertaken by knowledgeable persons with the assistance and oversight of governmental agencies. The Board was certainly justified in being concerned with the safety of citizens, but there is no affirmative evidence that the above efforts have not been successful. The evidence was not enough to persuade the Board that they had been successful. On remand, with the benefit of specific findings by the Board, Gollahon will have the opportunity to address the specific areas of concern.

Gollahon is entitled to address the deficiencies perceived by the Board. This is especially so given the considerable confusion regarding issues and procedure related to the hearing, and the fact that the applicant had no advance specific information about the perceived deficiency, other than the general concern regarding ordnance safety.

While it was reasonable for the Board to question the safety of the Property, it would have been unreasonable to determine that the Property was unsafe and to prohibit all development, based on the present record, had the Board made that determination. *See Lewis v. Dept. of Natural Resources,* 377 Md. 382, 408, 833 A.2d 563 (2003)("the record contains little or no empirical data to support the Board's conclusions or to refute

the studies and reports of petitioner's experts. The Board's decision is thus arbitrary and capricious.").

Based on our analysis, if the Board had remanded the matter to the Planning Commission for further analysis on the issue of safety, or had modified the Planning Commission's decision in a manner supported by the evidence, we would affirm. *See Hikmat v. Howard County, supra,* 148 Md.App. at 531, 813 A.2d 306. Because the Board reversed the Planning Commission, we must vacate the Board's decision and remand to the Board to either remand to the Planning Commission or to conduct further proceedings itself. On remand, the Board must permit further proceedings to determine whether the Property, or some portion of it, is suitable for residential development, and if so, to what extent and under what restrictions, applying a reasonable and non-arbitrary standard. Additionally, it must include specific findings of fact and conclusions in its opinion, whether it conducts the proceedings itself or on appeal after remand to the Planning Commission.[9]

### *Jurisdiction to Consider Potential Harm to Public Safety*

The Board found that Gollahon failed to adequately address "the potential harm to public safety presented by unexploded ordnance at the subject property." Although the circuit court reversed the decision of the Board, the court noted that the Board did in fact have the authority and jurisdiction to make such a determination with regard to Gollahon's application for subdivision approval. Gollahon alleges error on the part of both the Board and the circuit court, arguing that, because its application for subdivision approval otherwise met all the requirements of the subdivision ordinance for St. Mary's County, the Board did not have any statutory authority to address the potential harm to public safety presented by the unexploded ordnance.

---

**9.** To make our holding clear, we expressly state that we are not shifting the burden of proof. The burden remains on Gollahon. We are addressing the evidentiary requirements to support the Board's decision.

Gollahon cites *Restivo v. Princeton Construction Co.*, 223 Md. 516, 523, 165 A.2d 766 (1960), in which the Court of Appeals stated that "where a given plan complies with every limitation imposed by the Ordinance, the Board is not authorized to prescribe further limitations based on its own concepts of what is desirable in the public interest." Noting that it is undisputed that the Property, at least with respect to Section 1, Phase 1, satisfied the requirements of the St. Mary's County development standards and met all regulatory requirements, Gollahon contends that its subdivision project met all of St. Mary's County development standards. Gollahon claims that the Board sought to prescribe its own limitations based on what it believed was in the best interest of the public, in contravention of Maryland case law, as outlined in *Restivo*.

Although the *Restivo* Court did say that a Board may not look outside the laws established by the legislature to impose its own beliefs or requirements for approval of a construction project, it found that the proposed project did not meet all of the requirements of the applicable ordinance. 223 Md. at 523, 165 A.2d 766. Even though the statement by the Court may be dicta, it is sound. The Board in the instant case did not look outside of established law, however, because it relied on various provisions of Md.Code., Art. 66B, and the St. Mary's County Subdivision Regulations.

 Under Md.Code, Art. 66B § 4.07(d)(1), the Board is given the power to "[h]ear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative officer in the enforcement of this article or any ordinance adopted under this article[.]" Because an "administrative officer" includes a planning commission, *see Wharf at Handy's Point, Inc. v. Dept. of Natural Resources*, 92 Md.App. 659, 610 A.2d 314 (1992), the Board clearly had jurisdiction to hear and decide this case. Moreover, it is clear that the Board had "all the powers of the administrative officer from whom the appeal is taken." Md.Code, Art. 66B § 4.07(h)(2).

The administrative officer, in this case the Planning Commission, was responsible for ensuring that the subdivision requirements were upheld. The St. Mary's County Subdivision Regulations provide, in part, that "[t]he purpose of the regulations are: (1)[t]o protect and provide for the public health, safety, and General Welfare of the County...." St. Mary's County, Maryland Subdivision Regulations § 1.03(B)(1)(1993). These regulations also state that the Planning Commission may impose such additional reasonable conditions for design, dedication, improvement, and restrictive use of the land as they may see fit to protect the safety, health, and general welfare of the future owners in the subdivision and of the County at large. *Id.* at § 1.10.

Thus, the Board had jurisdiction and authority, under both the Md.Code and the St. Mary's County Subdivision Regulations, to consider public safety as one factor in its determination whether to approve development of the Property. The circuit court did not err in finding that the Board had authority to consider this point.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR ST. MARY'S COUNTY WITH INSTRUCTIONS TO VACATE THE BOARD'S DECISION AND REMAND TO THE BOARD FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEES.**